BILL BERRUM, Washoe County Treasurer, Appellant, v. CHARLES OTTO, Trustee of the Otto Family Trust; TODD LOWE, Trustee of the Lowe Family Trust; AND V PARK, LLC, a Nevada Limited Liability Company, for Themselves and on Behalf of Similarly Situated Residential Property Owners and Taxpayers at Incline Village/Crystal Bay, Washoe County, Nevada, Respondents.

No. 54947

July 7, 2011                                    255 P.3d 1269

---

*Richard A. Gammick*, District Attorney, and *David C. Creek-man*, Deputy District Attorney, Washoe County, for Appellant.

*Morris Peterson* and *Suellen E. Fulstone*, Reno, for Respondents.

Before the Court EN BANC.[1]

## OPINION

By the Court, HARDESTY, J.:

This appeal arises out of an ongoing conflict between Washoe County and taxpayers in Incline Village and Crystal Bay regarding property tax valuation, equalization, and collection.[2] In this appeal, we must determine whether the district court properly issued a writ of mandamus requiring the Washoe County Treasurer to refund excess taxes paid by the respondent Taxpayers for the 2006-2007 tax year. The Taxpayers paid the excess taxes because of a stay imposed in a pending appeal challenging a prior year's assessments. We conclude that the district court properly issued the writ of mandamus because the Taxpayers paid more than was due and typical administrative remedies to recover overpaid taxes do not apply where the Taxpayers were successful at all levels below. Additionally, the Treasurer had a duty to refund the excess taxes pursuant to NRS 360.2935.

### FACTS

The Taxpayers are owners of real property situated near Lake Tahoe in Crystal Bay and Incline Village, Washoe County, Nevada. In January 2006, the district court concluded that the 2003-2004 property tax assessments for certain Incline Village and Crystal

---

[1]THE HONORABLE KRISTINA PICKERING, Justice, voluntarily recused herself from participation in the decision of this matter.

[2]See Village League v. State, Bd. of Equalization, 124 Nev. 1079, 194 P.3d 1254 (2008); State, Bd. of Equalization v. Barta, 124 Nev. 612, 188 P.3d 1092 (2008); State, Bd. of Equalization v. Bakst, 122 Nev. 1403, 148 P.3d 717 (2006).

Bay properties were unconstitutional and ordered the Washoe County Assessor to roll back the tax valuations for those properties to 2002-2003 levels. The court also ordered a refund of any excess taxes that had been paid by the affected taxpayers while the case was pending.[3] The Assessor appealed the district court's decision to this court, *see State, Bd. of Equalization v. Bakst*, 122 Nev. 1403, 148 P.3d 717 (2006), and in February 2006, we stayed enforcement of the district court's order pending our disposition of the appeal. Although no refunds could be granted during the pendency of our stay, our order explained that the County Board could continue to evaluate taxpayers' petitions seeking to roll back their tax valuations, so long as no rollbacks were implemented.

Shortly thereafter, in March 2006, the County Board issued a general equalization decision rolling back residential property tax valuations in the Incline Village and Crystal Bay areas. This time, however, the tax year at issue was 2006-2007; the Board, in an attempt to create an equal rate of taxation for the Incline Village and Crystal Bay property owners not affected by the previous decision to roll back tax valuations, decided to revert valuations to the 2002-2003 levels. As noted above, the stay order prevented enforcement of any rollbacks until disposition of the Assessor's earlier appeal in *Bakst* regarding the 2003-2004 tax values. The Assessor immediately appealed the County Board's decision to the State Board of Equalization, but the State Board deferred considering the issue because of the stay and because the *Bakst* case was still pending before this court.

## The Bakst decision

In December 2006, this court issued an opinion in *Bakst*, affirming the district court's findings regarding the 2003-2004 property tax assessments and holding that the Assessor's unapproved appraisal methodology for assessing properties in the Incline Village and Crystal Bay areas was unconstitutionally inconsistent with his approach elsewhere in Washoe County. *Bakst*, 122 Nev. at 1416, 148 P.3d at 726. Thus, we held that taxpayers whose properties were valued using the disputed methodologies were entitled to a refund plus interest pursuant to NRS 360.2935. *Bakst*, 122 Nev. at 1417, 148 P.3d at 726.[4]

---

[3]The details of the actions leading to the district court's decision and related events can be found in our prior opinions. *See Village League*, 124 Nev. at 1081-85, 194 P.3d at 1256-58; *Barta*, 124 Nev. at 617-19, 188 P.3d at 1095-97; *Bakst*, 122 Nev. at 1405-08, 148 P.3d at 719-21.

[4]Another group of taxpayers, including some of the *Bakst* taxpayers, made a similar challenge to the Assessor's valuations for the 2004-2005 tax year. *Barta*, 124 Nev. 612, 188 P.3d 1092. This court concluded that, in assessing the taxable values for that year, the Assessor employed methods deemed unconstitutional in *Bakst*. *Id.* at 616, 188 P.3d at 1095. This court determined

Immediately after the *Bakst* decision, which effectively lifted this court's stay, the Assessor corrected the assessment rolls for the 2006-2007 tax year to reflect 2002-2003 valuations for Incline Village and Crystal Bay, in accordance with the County Board's March 2006 equalization decision. And in April 2007, the State Board proceeded with the Assessor's appeal of that equalization decision. At the State Board's hearing, it stayed enforcement of the County Board's decision and remanded the matter to the County Board for further factual findings. However, the taxpayers immediately sought a writ of mandamus from this court to force the State Board to hear the Assessor's appeal on the merits. *Village League v. State, Bd. of Equalization*, 124 Nev. 1079, 194 P.3d 1254 (2008). This court granted the writ petition and directed the State Board to hear the Assessor's appeal of the County Board's decision to reduce the 2006-2007 tax year assessments to 2002-2003 levels. *Id.* at 1091, 194 P.3d at 1262-63.

In July 2009, the State Board proceeded with the merits of the Assessor's appeal from the County Board's equalization decision. At the hearing, the State Board orally voted to uphold the County Board's decision. Its written decision affirming the County Board's equalization decision was entered in October 2009.

## *The district court's writ of mandamus, which is the subject of this appeal*

Meanwhile, after the Treasurer rejected a demand by the Taxpayers to refund the excess taxes and did not immediately issue refunds of taxes paid in excess of the 2002-2003 tax year levels, the Taxpayers petitioned the district court for a writ of mandamus to compel him to do so. During his testimony before the district court, the Treasurer explained that, typically, once there is a final written order from the State Board and the Assessor has updated the tax rolls, the Treasurer adjusts his collections, including issuing refunds if required. He also stated that, in the scheme of tax collection, one of his jobs is to issue refunds when the Assessor updates the assessment roll. However, he maintained that he did not pay refunds in this case because of the ongoing legal proceedings related to the assessments and because he had not received a final written decision from the State Board specifically instructing him to issue refunds.

Although the State Board had not yet issued its final written order upholding the County Board's equalization decision, the district court granted the petition and issued the writ. The writ mandated that the Treasurer comply with the County Board's decision

---

that *Barta* was indistinguishable from *Bakst* and thus affirmed the district court's determination that the 2004-2005 assessments were void, concluding that the taxpayers were entitled to a refund of taxes paid in excess of the 2002-2003 assessed values. *Id.* at 628, 188 P.3d at 1103.

to roll back the 2006-2007 taxable values for 8,700 properties located in the Incline Village and Crystal Bay areas to 2002-2003 levels. In its order, the district court outlined the typical procedure for issuing refunds, finding that the Treasurer had a duty to conform his collections to the updated assessment roll and issue refunds if required. Because the Treasurer had collected taxes at the unreduced rate despite the Assessor's update to the assessment roll, the district court mandated that the Treasurer was to calculate the overpayments for the "2006-2007 [tax year] and subsequent years," compute interest pursuant to the formula contained in NRS 361.486, and refund the total amount to the affected taxpayers. The Treasurer now appeals the district court's order granting the petition for a writ of mandamus.

## DISCUSSION

This court generally reviews a district court's decision to grant a petition for writ of mandamus for abuse of discretion. *Kay v. Nunez*, 122 Nev. 1100, 1105, 146 P.3d 801, 805 (2006). However, this court reviews related statutory and legal issues de novo. *Las Vegas Taxpayer Comm. v. City Council*, 125 Nev. 165, 172, 208 P.3d 429, 433-34 (2009); *Marquis & Aurbach v. Dist. Ct.*, 122 Nev. 1147, 1156, 146 P.3d 1130, 1136 (2006). "A writ of mandamus is available to compel the performance of an act which the law requires as a duty resulting from an office, trust or station . . . or to control an arbitrary or capricious exercise of discretion." *State v. Dist. Ct.*, 116 Nev. 374, 379, 997 P.2d 126, 130 (2000) (internal citation omitted). Thus, the petitioner must meet two requirements for mandamus relief: there must be no other available remedy at law, *see id.*, and the required act must be within the duties of the person compelled to act. *State of Nevada v. Watterman*, 5 Nev. 323, 326 (1869).

The Treasurer argues on appeal that a writ of mandamus in this instance was inappropriate because Nevada's statutory tax collection scheme provides the Taxpayers with an appropriate legal remedy for overpayment of taxes and because he had no legal duty to refund the excess amounts. But because we conclude that the Taxpayers had no available statutory or legal remedy to obtain a refund and the Treasurer had an affirmative duty to refund, writ relief was appropriate.

### No legal remedies were available

Generally, a taxpayer must "exhaust [his] administrative remedies before seeking judicial relief" from tax assessments and determinations. *Washoe County v. Golden Road Motor Inn*, 105 Nev. 402, 403, 777 P.2d 358, 359 (1989). NRS 361.420(1) requires a

taxpayer who believes that he or she is being taxed "in excess of the amount . . . justly to be due" to notify the Treasurer, in writing, that he or she is paying under protest. After the taxpayer pays under protest, he or she may then bring a complaint before the County Board and, if necessary, appeal to the State Board. NRS 361.420(2). If denied relief, the taxpayer may commence an action in the district court. *Id.*

The Treasurer argues that these statutory requirements under NRS 361.420 "envision a suit for precisely the relief ultimately sought by these taxpayers." He contends that the district court could not grant a refund because the Taxpayers did not pay under protest for the 2006-2007 tax year. The Taxpayers argue that they prevailed before the County Board because the Board decided to roll back their assessed values and the Treasurer would have collected taxes at the lower rate but for this court's stay. Therefore, they had no reason to pay under protest. We agree.

NRS 361.420(2) states that a taxpayer who protests *and* has been "denied relief by the State Board of Equalization" may commence a lawsuit for recovery of excess taxes. Similarly, NRS 361.420(3) requires a taxpayer to commence a suit for overpaid taxes within three months after paying the tax under protest or within three months after the "decision of the State Board of Equalization denying relief."

Here, although the County Board made an equalization decision to roll back taxable values for the 2006-2007 tax year to the 2002-2003 levels, it could not enforce that decision because the *Bakst* stay order enjoined it from implementing any rollbacks while the stay was pending. Thus, at the time of collection for the 2006-2007 tax year, the Taxpayers were not overpaying their taxes because the stay prevented any rollback of the taxable valuations. Until the stay was lifted and the State Board heard the Assessor's appeal of the County Board's March 8, 2006, decision, the Taxpayers had no grounds, or reason, to pay under protest because they were required to pay the amount listed on the 2006-2007 assessment roll. Even if the Taxpayers had paid under protest, NRS 361.420(2) would not have provided relief because it applies only if the taxpayer has previously "been denied relief by the State Board of Equalization." These Taxpayers were not denied relief but instead prevailed before the County Board and, ultimately, the State Board. Therefore, we conclude that the Taxpayers were not required to pursue the protest remedies in NRS 361.420 before seeking a refund under the procedural facts of this case.

Having concluded that no alternative legal remedies existed to preclude writ relief, we must now determine whether the Treasurer had a duty to refund the excess taxes paid by the Taxpayers.

*The Treasurer had a duty to refund excess taxes*

The Treasurer argues that he had no duty to refund the excess taxes because the State Board failed to direct him to do so, as required under NRS 361.405(4), and no other authority for doing so exists.[5]

NRS 361.405(4) governs the duties of the Treasurer when changes to assessed property valuations are made, stating:

> As soon as changes resulting from cases having less than a substantial effect on tax revenue have been certified to the county tax receiver by the Secretary of the State Board of Equalization, the county tax receiver shall adjust the assessment roll or the tax statement or make a tax refund, as directed by the State Board of Equalization.[6]

---

[5]The Treasurer also argues as a matter of policy that the voluntary payment doctrine precludes him from issuing refunds. Under the voluntary payment doctrine, if a taxpayer tenders a tax, assessment, or exaction voluntarily, he or she is generally not entitled to a refund except as provided for by statute. *See* 16 Eugene McQuillin, *The Law of Municipal Corporations* § 44.180 (3d ed. 2003) ("[G]enerally, in the absence of statute there can be no recovery of taxes which have been voluntarily paid."); *see also Video Aid Corp. v. Town of Wallkill*, 651 N.E.2d 886, 888 (N.Y. 1995) ("The settled law is that the payment of a tax or fee cannot be recovered subsequent to the invalidation of the taxing statute or rule, unless the taxpayer can demonstrate that the payment was involuntary."). The purpose of this doctrine is to encourage stability and certainty for the taxing entity. *See City of Laredo v. South Texas Nat. Bank*, 775 S.W.2d 729, 731 (Tex. App. 1989); *see also Budget Rent-A-Car of Tulsa v. Tax Com'n*, 773 P.2d 736, 739 (Okla. 1989).

The Treasurer argues that NRS 361.420 is Nevada's version of the voluntary payment doctrine. However, these circumstances are unique from those envisioned in NRS 361.420 because, here, the Taxpayers successfully challenged the basis of their 2006-2007 assessments, prevailed before the County Board, and were simply waiting for this court to decide the *Bakst* appeal and to lift the stay preventing enforcement of the rollback of their taxable valuations. Therefore, we conclude that the voluntary payment doctrine does not apply to these Taxpayers. Furthermore, disallowing refunds in this case would not further the voluntary payment doctrine's policy goals of certainty and stability. The Treasurer knew that the Taxpayers had challenged the assessed taxable values, and he knew that the Taxpayers prevailed before the County Board on March 8, 2006, so he could have planned appropriately.

[6]NRS 361.405(4) applies when the effect on tax revenue is not substantial, and NRS 361.405(2) applies when the effect on tax revenue is substantial. At its annual session regarding the 2006-2007 tax year, the State Board concluded that the County Board's March 8, 2006, decision would not have a substantial effect on revenue despite the $12 million at stake. *See Village League v. State, Bd. of Equalization*, 124 Nev. 1079, 1083, 194 P.3d 1254, 1257 (2008). However, the State Board made this decision based, at least in part, on the fact that the County Board's decision was not yet final because of the stay in effect at the time. *Id.* Because we conclude that this statute does not apply to the refund issues before us, the distinction is irrelevant to this case.

According to this statute, the State Board could have ordered the Treasurer to adjust the assessment roll or the tax statement, or to make a refund, based on changes certified by the State Board.

At its July 2009 hearing, the State Board orally voted to uphold the County Board's decision to roll back the taxable values of the Incline Village and Crystal Bay area properties to 2002-2003 levels, but it did not explicitly refer to a refund of excess taxes collected.[7] Thus, the Treasurer argues, the State Board opted to adjust the assessment roll but not to refund the tax money. Without the State Board's specific order to refund taxes, the Treasurer claims that he had no duty to refund them. We disagree. As demonstrated above, even if the State Board's order is as the Treasurer states, the State Board's failure to explicitly direct a refund in this case does not abrogate the district court's power to enforce any other statutory duty to issue a refund.

The plain language of NRS 361.405(4) indicates that its remedies apply only when the State Board *changes* valuation decisions made by county boards. If the State Board makes such a change, it necessarily follows that it must direct the Treasurer regarding how to implement its change. For example, if the Assessor prevailed in an appeal before the State Board, the State Board would then have to direct the tax receiver[8] to adjust the assessment roll to reflect the increase so that the Treasurer could collect taxes accordingly. Conversely, if the State Board decision resulted in lower taxes, the Board would have to order an adjustment of tax statements or order a refund of excess taxes paid. Here, however, the State Board upheld the County Board's decision to roll back tax valuations but made no changes of its own to assessed values. Thus, the remedies in NRS 361.405(4) are not applicable here because the State Board did not need to direct the Treasurer to take action as a result of its decision.

Typically, in cases such as this, the County Board's decision would be implemented immediately, and no adjustment to the as-

---

[7]The Treasurer requests that we take judicial notice of the State Board's final written decision, entered after the district court granted the writ. He claims that the written decision required that the assessment roll be certified but did not direct the Treasurer to issue any refunds. He contends that this failure to require refunds precludes his duty to issue them. However, neither party provided this court with this document, so we decline to take judicial notice of the State Board's written decision, and we do not address the Treasurer's argument on this point. *See Mack v. Estate of Mack*, 125 Nev. 80, 91, 206 P.3d 98, 106 (2009) (holding that this court generally will not take judicial notice of records in other matters); *Carson Ready Mix v. First Nat'l Bk.*, 97 Nev. 474, 476, 635 P.2d 276, 277 (1981) (providing that this court will not consider evidence not appearing in the record on appeal).

[8]In Washoe County, the Treasurer is the designated tax receiver, but the Assessor manages the assessment roll.

sessment rolls after the State Board's affirmance would be necessary. This situation arose, again, because of the stay imposed by this court preserving the status quo pending our consideration of the *Bakst* appeal. Once the stay was lifted, the County Board's decision could be fully implemented. The Treasurer, however, continues to assert that, now that they have been paid, no authority exists allowing him to refund the excess taxes. He overlooks NRS 360.2935.

Pursuant to NRS 360.2935, "a taxpayer is entitled to receive on any overpayment of taxes . . . a refund." This is the same statutory ground upon which we ordered similar refunds in *Bakst*. In that case, we concluded that refunds were proper because of the Assessor's use of unconstitutional methods for assessing property values. *Bakst*, 122 Nev. at 1416-17, 148 P.3d at 726; *see also State, Bd. of Equalization v. Barta*, 124 Nev. 612, 628, 188 P.3d 1092, 1103 (2008). Here, under NRS 360.2935, the Treasurer has a duty to refund the excess taxes paid during our stay of the County Board's equalization decision. Once we decided *Bakst* and the stay was lifted, the only means of placing the Taxpayers in the position they would have been in absent the stay is by refunding the excess amounts paid.[9]

Accordingly, because the Taxpayers' requested refund is not barred by their failure to comply with any particular statutory scheme and the Treasurer had a duty to refund, we affirm the district court's order granting the Taxpayers' petition for a writ of mandamus.[10]

DOUGLAS, C.J., and CHERRY, SAITTA, GIBBONS, and PARRAGUIRRE, JJ., concur.

---

[9]The Treasurer also argues that he should not have to issue refunds because: (1) NRS 249.020 and 249.130, which outline some of the general duties of his sworn office, preclude issuing refunds; and (2) the refund provisions in NRS 354.220-.250 do not provide a basis for his duty to refund in this case. We conclude that these arguments are without merit.

[10]The stay imposed by our February 18, 2010, order is hereby vacated.